IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

SHIRLEY K. ROSE,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )    Case No.
                                    )    05-4004-CV-C-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,                 )
                                    )
            Defendant.              )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Shirley Rose seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Titles
II and XVI of the Social Security Act ("the Act").
Plaintiff argues that (1) the ALJ's decision that plaintiff
could return to her past relevant work is not supported by
substantial evidence, (2) the ALJ failed to develop the
record in regard to plaintiff's mental impairment, and (3)
the ALJ failed to properly develop medical evidence
regarding the opinion of plaintiff's treating doctor, Dr.
Christopher Farmer.  I find that substantial evidence in the
record supports the ALJ's decision, and that the issues
raised by plaintiff are without merit.  Therefore,
plaintiff's motion for summary judgment will be denied and
the decision of the Commissioner will be affirmed.

## I.  BACKGROUND

On February 4, 2003, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since November 6, 2001.  Plaintiff's disability stems from pain; stiffness; and swelling in her back, hand, knees, and ankle.  Plaintiff's application was denied on February 15, 2002.  On March 25, 2004, a hearing was held before an Administrative Law Judge.  On June 17, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On November 12, 2004, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The

2

determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

3

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

4

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.   *THE RECORD*

The record consists of the testimony of plaintiff, Carol Carson, and vocational expert Ruth Van Vleet, in addition to documentary evidence admitted at the hearing.

## A.   *EARNINGS RECORD*

The record shows that plaintiff earned the following income from 1974 through 2003, shown in both actual and

indexed earnings:

| Year | Earnings | Indexed Earnings |
|------|----------|------------------|
| 1974 | $    77.31 | $    293.33 |
| 1975 | 0.00 | 0.00 |
| 1976 | 7.34 | 24.24 |
| 1977 | 0.00 | 0.00 |
| 1978 | 177.01 | 510.94 |
| 1979 | 2,437.05 | 6,468.64 |
| 1980 | 0.00 | 0.00 |
| 1981 | 0.00 | 0.00 |
| 1982 | 0.00 | 0.00 |
| 1983 | 182.57 | 365.04 |
| 1984 | 274.09 | 517.60 |
| 1985 | 0.00 | 0.00 |
| 1986 | 1,402.56 | 2,467.16 |
| 1987 | 1,759.15 | 2,908.91 |
| 1988 | 4,043.85 | 6,372.98 |
| 1989 | 4,829.43 | 7,321.16 |
| 1990 | 3,232.55 | 4,684.01 |
| 1991 | 4,591.68 | 6,414.37 |
| 1992 | 4,985.95 | 6,623.86 |
| 1993 | 3,757.70 | 4,949.56 |
| 1994 | 5,556.41 | 7,127.48 |
| 1995 | 4,075.62 | 5,026.52 |
| 1996 | 1,743.19 | 2,049.66 |
| 1997 | 1,969.71 | 2,188.32 |

6

| | | |
|---|---:|---:|
| 1998 | 10,026.82 | 10,585.60 |
| 1999 | 13,624.26 | 13,624.26 |
| 2000 | 15,395.15 | 15,395.15 |
| 2001 | 17,174.14 | 17,174.14 |
| 2002 | 102.94 | 102.94 |
| 2003 | 0.00 | 0.00 |

(Tr. at 130-131).

**B.    *SUMMARY OF MEDICAL RECORDS***

Plaintiff had a Standford Binet Intelligence Scale Test done on September 11, 1967, when she was 15 years old (Tr. at 132-34).  It was recommended that plaintiff be placed in special education (Tr. at 134).

On January 2, 2000, plaintiff was seen at the emergency room at the University of Missouri Hospital and Clinics (Tr. at 229).  Plaintiff had the flu and bronchitis.

Plaintiff was seen at the emergency room of University of Missouri Hospital and Clinics on March 17, 2000, due to bilateral leg pain (Tr. at 231).  Plaintiff had been having pain off and on for the last six months, worsening over the last two months.  Plaintiff had increased pain when walking in the morning and when getting out of bed.  Jack Wells, M.D., assessed bilateral tendonitis [inflammation of the

7

tendons] and fasciitis[1].  He gave plaintiff a prescription
for Relafen twice a day.

Plaintiff was seen at University of Missouri Hospital
and Clinics on March 22, 2000, due to leg and feet pain (Tr.
at 403-404).  There was very mild tenderness to palpation at
both heels.  Pain did not extend to the plantar surface of
the foot.  Strength was 5/5 in both feet as well as toes.
The pain was not reproducible with flexion, extension,
eversion, or inversion at the ankle.  Plaintiff was noted to
most likely have mild plantar fasciitis with possible heal
cord tightening.  She was told to do exercises and
stretching, and Dr. Kirsten recommended continuing Relafen
as needed, which plaintiff had reported "helped
substantially."

Plaintiff was seen again at the University of Missouri
Hospital and Clinics emergency room on September 17, 2000,
due to right knee pain (Tr. at 236-237).  An x-ray of her
knee showed it to be intact.

Plaintiff was seen at the emergency room again on
September 18, 2000, due to dizzy spells and blacking out
(Tr. at 238).  A CT scan of plaintiff's head was normal (Tr.

---

[1]Inflammation of the fascia, a lining tissue under the
skin that covers a surface of underlying tissues.

8

at 370).

Plaintiff went to the emergency room on November 3, 2000, because of a dental abscess (Tr. at 247).

On December 9, 2000, plaintiff returned to the emergency room with a headache, sinus pressure, sore throat (Tr. at 248). She reported that she had been taking Relafen for swelling in her hands and feet, but she had run out and wondered if she could try taking Vioxx instead. Plaintiff reported smoking less than a half a pack of cigarettes per day. She was diagnosed with viral syndrom and was given samples of Vioxx.

On December 12, 2000, plaintiff went back to the emergency room (Tr. at 249-258). Plaintiff had gotten her ear pierced at the top of the ear three to four days earlier and it was now swollen, red, and tender. She was diagnosed with an ear infection.

Plaintiff was seen at the emergency room on January 13, 2001, for a follow-up on her ankle and knees (Tr. at 399). Most of this record is illegible.

On March 26, 2001, plaintiff went back to the emergency room complaining of left ankle pain (Tr. at 260-263). Plaintiff said it felt like someone was sticking an ice pick in her ankle. She rated the pain an eight out of ten. X-

9

rays of the left foot and left ankle were noted as "OK" (Tr. at 260).

On April 13, 2001, plaintiff returned to the University of Missouri Hospital and Clinics for a follow-up on her ankle and knee problem (Tr. at 392-394). Plaintiff said she was eating one meal per day but was having trouble losing weight. She was instructed on proper diet and exercise. Dr. Hertz discussed with plaintiff the importance of eating smaller, more frequent meals with lower fat and sugar content, as well as engaging in regular aerobic exercise.

On May 24, 2001, plaintiff was seen at the emergency room due to shakes, headache, and dizziness (Tr. at 270). She was diagnosed with benign positional vertigo and was prescribed Antivert, an antihistamine.

On August 2, 2001, plaintiff returned to the University of Missouri Hospital and Clinics due to stabbing pain in her ankles and right knee bilaterally (Tr. at 266-267, 390-391). An x-ray of the left knee showed degenerative spurring on the posterior aspect of the patella due to some arthritis. Plaintiff was sent to the University of Missouri Family Medicine Department (Tr. at 266). Plaintiff said she was having difficulty picking up boxes and climbing ladders at work, and would like to get a different job as a door

10

greeter.  "Per her own history, she does not mention any other joint pain, but I had talked to her supervisor about getting a special form for her to return to work which I found out toward the end of the visit, and it seems like she has had a Workman's compensation situation with back problems but is now back to work from that, that part is resolved."

Plaintiff was taking ibuprofen alternating with Extra Strength Tylenol, "which is pretty helpful."  During the physical exam, the doctor noted that plaintiff's left knee was quite tender along the joint line bilaterally, but neither knee appeared unstable.  An x-ray of her left knee appeared to show that she had a bone spur.  Plaintiff had fairly tight Achilles tendon, a little swelling over the ankle area, and some bruising along the top of her feet. The swelling was noted to be probable venous incompetency. The doctor diagnosed possible arthritis of the knee and ankle, and some dependent edema.  "I taught her some quadriceps strengthening exercises."  Plaintiff was told to wear her shoes looser and use support hose, she was given ankle exercises and exercises for her feet, and she was told to lose weight.  Plaintiff requested a "maximum medical

improvement" form so that she could be transferred to a door greeter position at Wal-Mart.

Plaintiff attended physical therapy sessions at Rusk Rehabilitation Center at the University of Missouri Hospital and Clinics from August 8, 2001, through August 23, 2001 (Tr. at 275-289).

On September 16, 2001, plaintiff was seen at the University of Missouri Hospital and Clinics for headaches and shaking (Tr. at 264-265, 290-291). She reported that she had been taking Vivarin[2] for the past three weeks to help her stay awake at work, but she stopped taking it a few days ago. She reported that she quit smoking two weeks earlier. She was diagnosed with caffeine withdrawal, was given Toradol (a non-steroidal anti-inflammatory), and her pain improved.

On October 5, 2001, plaintiff went to the Family Medicine Clinic due to left leg pain (Tr. at 296). Christopher Farmer, M.D., diagnosed bursitis and prescribed Naprosyn (non-steroidal anti-inflammatory), ice, and physical therapy for four weeks.

_____

[2]Vivarin is an over-the-counter alertness aid with caffeine as its active ingredient.

12

On October 27, 2001, plaintiff went to the emergency room due to hand swelling (Tr. at 293-295). She reported that she touched a shopping cart and five minutes later her hand began to swell and itch. She adjusted her glasses and developed a headache. Jessica Haney, M.D., diagnosed contact dermatitis.

November 6, 2001, is plaintiff's alleged onset date.

On December 28, 2001, plaintiff was seen by Jennifer Clark, M.D., an orthopedic doctor, at the request of Disability Determinations (Tr. at 297-302). Plaintiff complained of pain, numbness and burning in her legs, and pain in her hands. She reported smoking two packs of cigarettes per month, and she exercises doing a tape called "Walk Away the Pounds".

Plaintiff reported that her pain was worse with going up or down stairs or standing too long. She felt better when she sat in a straight-back chair with her legs on a stool. She complained of pain with bending, lifting, and standing, but not with sitting. "She states she can sit for forever, walk six blocks, and stand for an hour." She said she had difficulty lifting more than 25 pounds, bending, or kneeling. She complained of depression and crying.

13

Dr. Clark reviewed previous x-rays of plaintiff's right knee, left foot, left knee, and left ankle, as well as her previous medical records (Tr. at 298).

Plaintiff said she was not wearing the support hose as recommended by her doctors because she could not afford them. She said she gets a pressure-like feeling in her low back. Dr. Clark performed a physical exam:

> She has 1+ muscle stretch reflexes at the deltoid, biceps, triceps, brachioradialis, finger flexors, patella, and Achilles. She has 5/5 strength for shoulder abduction, elbow flexion and extension, wrist extension, wrist flexion, handgrip, hand intrinsics, hip flexion and extension, knee extension, knee flexion, dorsiflexion, plantar flexion, and extensor hallucis longus. She has normal sensation to pinprick and light touch. There is no warmth, redness or swelling of any joint. She has no venous insufficiency or edema. There was no pitting. There were no sock lines. She was only partially cooperative with some parts of the exam. When asked to squat, she would squat for about 10° and stated she couldn't go farther. However, she has squatted farther than that earlier when doing another activity. She was able to walk on her heels and toes. When asked to bend forward, she initially only bent forward 50%, but then was later able to demonstrate full flexion. She had normal extension. She complained of exquisite tenderness to light touch in the area of her greatest lumbar lordosis, at approximately L3-4. She had full active range of motion of the shoulders, elbows, hips, wrists, knees, and ankles as well as the cervical spine. She had no tenderness in the cervical spine area or shoulders. There was no swelling noted in her hands. . . . She was non-tender about the feet and ankles. She had no instability about the ankles. She had full active range of motion of the hips without complaints of pain. She walks with a normal gait. She requires no assistive device. She complains of depression, but

14

she did not appear to be depressed or anxious on
examination, although she displayed displeasure with
her son wanting her 2000 Neon with a turbo charged
engine, and for her to leave it in her Will to him.

IMPRESSION:
1.   Obesity.
2.   Mild hypertension.
3.   History of mild venous insufficiency.
4.   History of intermittent low-back pain.
5.   Symptoms of meralgia paresthetica.
6.   History of mild osteoarthritis.

I see no restrictions regarding sitting, standing or
walking.  She was recommended to wear support hose.  I
would recommend keeping her lifting and carrying to 50
pounds or less due to decondition.  She would probably
[do] best at 25 pounds on a more regular basis.  She is
unrestricted in handling objects, hearing, speaking,
and traveling.  She had no symptoms suggestive of
carpal tunnel syndrome - such as her hands falling
asleep at night or anything of that nature.

Plaintiff went to the emergency room on January 4,

2002, due to back pain (Tr. at 303).  An x-ray of

plaintiff's lumbar spine showed minimal degenerative change

of the facets in the lower lumbosacral spine (Tr. at 306).

She was prescribed Celebrex, a non-steroidal anti-

inflammatory.

On January 16, 2002, Mark Altomari, Ph.D., completed a

Psychiatric Review Technique finding no medically

determinable mental impairment (Tr. at 307).

On April 17, 2002, plaintiff saw Dr. Farmer at the

University of Missouri Hospital and Clinics due to swelling

15

in her hands, legs, and feet for the last two weeks (Tr. at
384-385). Plaintiff was taking no new medications and "has
no chronic medical problems to speak of." Dr. Farmer
assessed edema of unclear etiology and ordered lab work and
an echocardiogram.

Plaintiff had an echocardiogram[3] on April 25, 2002,
which suggested impaired left ventricle relaxation (Tr. at
382). Everything else appeared to be normal.

On October 31, 2002, plaintiff was seen by Aaron Sapp,
M.D., at University of Missouri Hospital and Clinic because
of back pain (Tr. at 379-381). Plaintiff also had some right
arm pain. She was not having any trouble reaching for
things, but was somewhat limited in her ability to comb her
hair. Plaintiff had point tenderness at the L5-S1 joint, no
paraspinous muscle tenderness. Straight leg raising was
negative, strength was 5/5 in both extremities. Dr. Sapp
assessed rotator cuff tendinoplasty, low back pain without
evidence of disc herniation, and obesity. "I have provided
her with a home exercise program for both her rotator cuff
and her low back pain and I have instructed her on how to do
the exercises. I feel that she could benefit from physical

---

[3]An electronic journal of cardiac ultrasound.

therapy but, because of the cost involved, she would like to
try this approach first. . . .  I also discussed with her
weight loss strategies and strategies for limiting her
caloric intake.  I encouraged her [to begin] an exercise
program.  Dr. Farmer previously evaluated her thyroid
function and found it to be normal."

Plaintiff saw Dr. Farmer for a follow up on November
25, 2002 (Tr. at 377-378).  "The patient does not have any
insurance and is currently not taking any medicines
secondary to cost."  Dr. Farmer examined plaintiff's
shoulder and found that she had mild supraspinatus weakness
and decreased internal rotation, but otherwise range of
motion was full.  "She has no tenderness in her back.  She
has full range of motion.  Negative straight leg raise
bilaterally, normal motion.  Normal deep tendon reflexes."

Dr. Farmer assessed rotator tendinopathy of the right
shoulder, "continue exercises and stretching"; chronic low
back pain, "continue exercises and stretching".  "Will talk
to the social Worker and try and get her into some sort of
indigent medication program, or perhaps Medicaid if she
qualifies."

On January 10, 2003, plaintiff returned to see Dr.
Farmer for a follow up on back and shoulder pain (Tr. at

374-375).  "She is currently on Relafen for chronic pain and
Flonase for allergic rhinitis neither of which she has been
able to take recently.  Her symptoms have not changed much."
Plaintiff's symptoms were unchanged on exam.  Dr. Farmer
assessed low back pain, bilateral shoulder pain, and
allergic rhinitis.  He gave her samples of Bextra [non-
steroidal anti-inflammatory] for her back and a sample of
Flonase for her allergies.  "Patient is going to bring in
information about income so that we perhaps could get her
into some indigent drug program. We will also contact our
social worker to see if she qualifies for Medicaid."

　　　　Plaintiff saw Dr. Farmer on February 27, 2003, for low
back pain (Tr. at 378).  Plaintiff reported she bent over
about a week earlier and noted back in her low back ever
since.  She denied any paraesthesias[4], radiation of pain, or
weakness.  Plaintiff was taking Bextra samples and was
exercising.  On exam, Dr. Farmer found mild tenderness over
the mid small of plaintiff's back near L4, L5 with some mild
paraspinal muscular tenderness. She had decreased flexion of
her back secondary to pain and central obesity.  Negative

---

　　　　[4]Burning or prickling sensation that is usually felt in
the hands, arms, legs, or feet. The sensation, which happens
without warning, is usually painless and described as
tingling or numbness, skin crawling, or itching.

straight leg raising bilaterally, strength was normal. Dr.
Farmer ordered x-rays which were negative for any acute bony
process (Tr. at 368-369). "She does have an extreme angle
noted of her sacrum."

Dr. Farmer assessed nonradicular low back pain. He
recommended exercises, anti-inflammatories, and heat as
needed. He gave her handouts on back exercises.

On March 10, 2003, Marc Maddox, Ph.D., a licensed
psychologist, completed a Psychiatric Review Technique (Tr.
at 329-342). He found that plaintiff suffers from organic
mental disorders based on borderline intellectual
functioning with an I.Q. of 78 assessed when she was 15
years old (Tr. at 330, 341). He found that plaintiff
suffers "none to mild" restriction in activities of daily
living; no difficulties in maintaining social functioning;
mild to moderate[5] difficulties in maintaining concentration,
persistence, or pace; and no repeated episodes of
decompensation (Tr. at 339).

In support, Dr. Maddox noted that plaintiff did not
allege disability based on a mental impairment, she has had
multiple years of substantial gainful employment, she is not

---

[5]Under moderate he wrote, "complex".

being treated for a mental impairment.  He wrote that plaintiff can clearly perform simple tasks as demonstrated by her work record, but that she likely would have difficulty with complex tasks.

Dr. Maddox also completed a Mental Residual Functional Capacity Assessment (Tr. at 343-345).  He found that plaintiff is "not significantly limited" to "moderately limited" in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to respond appropriately to changes in the work setting.  He found that she is not significantly limited in her ability to maintain attention and concentration for extended periods.  He found no evidence of limitation in any other mental category.

On April 8, 2003[6], Dr. Farmer wrote a letter to whom it may concern (Tr. at 366).  The letter stated that plaintiff had "a long history of low back pain.  At times this can be very disabling to her and she is unable to function.  Her current treatment plan includes high dose anti-inflammatory

---

[6]This letter is actually undated, but it has a "received" stamp dated April 8, 2003.  During the hearing, the parties agreed that the letter was written sometime around April 8, 2003, as it refers to plaintiff's age (Tr. at 84).

medications as well as exercises. She has been unable to obtain insurance up until now and this has made [the] treatment and recovery process very lengthy and difficulty for both of us. Currently she is functionally disabled from her back pain. My hope would be that we are able to relieve a majority of her symptoms and help her regain function."

On June 3, 2003, plaintiff saw Dr. Farmer for back pain and a rash on her feet (Tr. at 411). "I have instructed her in the past on exercises as well as weight loss. She continues to have intermittent musculoskeletal low back pain with no radicular symptoms. . . . She does take Aleve and Relafen daily one dose of each usually for her back symptoms." Exam produced some pain to palpation in the paralumbar region. She had full range of motion limited only by obesity.

Dr. Farmer's assessment included the following:

> 1.    Back pain. Recommended continuing current medications, exercises, as well as encouraged for continued weight loss. I think this will be a chronic problem for her if she does not lose weight.

On July 28, 2003, plaintiff returned to see Dr. Farmer for back pain and possible depression (Tr. at 410). "She comes in today with her typical symptoms of mild achiness and a feeling of heat in her low back. She has had x-rays

in the past which were negative and has been on anti-inflammatories which do relieve some of her symptoms. She denies any numbness, tingling, [or] neurological symptoms. . . . She is also curious today about depression. She has been having problems with increased tearfulness, trouble sleeping at night, and wondered if perhaps these are all interrelated. She has no suicidal or homicidal thoughts."

Dr. Farmer performed an exam. "Of her back, straight leg raise is negative bilaterally. She has some mild pain to palpation over the right prepatellar area but no other significant findings on exam." He noted that plaintiff's mood was appropriate and she smiled at times.

He assessed chronic low back pain. "Recommended continuing the anti-inflammatories and exercises to stretch her hamstrings and strengthen her quadriceps muscles as well as her back. Perhaps treating and addressing the depression issue will help with this problem." He also assessed depression. "Will have her [see] a physician who can continue to work with her on her depression issues in the next 1 to 2 weeks. She would likely benefit from starting an SSRI [selective serotonin reuptake inhibitors]." He assessed insomnia. "Recommended Benadryl for now and then treatment of the depression in the next week or two."

22

Plaintiff saw Scott Roos, M.D., on August 8, 2003, to establish care for depression and anxiety (Tr. at 408-409). Plaintiff reported that she has felt depressed over the last year since she lost her job, with the symptoms worsening over the past six months. "Patient had to declare bankruptcy and has numerous collection agencies calling her for money. . . . Patient states that she has had trouble sleeping recently because of worries and anxiety about her current state of affairs." Plaintiff was living with her boy friend, she reported she was a previous smoker of about 1 1/2 packs per week for 37 years, but was currently a non-smoker and non-drinker. Plaintiff reported no headaches, no shortness of breath, no chest pains or palpitations. On exam, Dr. Roos noted that plaintiff was in no acute distress, was alert and oriented, her affect was anxious, her speech was rapid. "Depression, per se, is not noted at this time." Dr. Roos prescribed Celexa and Ambien and told plaintiff to come back in two weeks.

Plaintiff returned to see Dr. Roos on September 8, 2003[7] (Tr. at 407). "Concerning the depression, patient

---

[7]Part of this record appears to be missing. There is one page; however, there is no assessment or plan, and there is no signature block, which appears on Dr. Roos's other medical records.

23

says that she is improved since last being seen in this clinic on 8/8/2003.  However, patient is still in a great amount of stress as she has had to declare bankruptcy and has numerous collection agencies calling her for money."  Plaintiff was still having trouble sleeping.  Plaintiff reported that she "gets good exercise in the form of walking the mall on a daily basis."

## C.   *SUMMARY OF TESTIMONY*

During the March 25, 2004, hearing, plaintiff testified; her friend Carol Carson testified; and Ruth Van Vleet, a vocational expert, testified at the request of the ALJ.

## 1.  **Plaintiff's testimony.**

At the time of the administrative hearing, plaintiff was 52 years of age and she is currently 53 (Tr. at 43).  Plaintiff did not finish high school and does not have a G.E.D. (Tr. at 43).  She can read and write, and she can make change "somewhat" (Tr. at 44).  She is 5' 4" tall and weighs 266 pounds (Tr. at 43).  Plaintiff used to weigh 287 pounds (Tr. at 44).  Her doctor told her to lose weight because her stomach was pulling her spine forward which was causing her spine to be curved resulting in back pain (Tr. at 44).

24

Plaintiff's children are all grown and live in Virginia (Tr. at 52). She lived in a trailer for three years with her boy friend, but he moved out and deserted her, so she became homeless (Tr. at 57). Plaintiff lived with her boy friend for 11 years total, and during that time he paid for her living expenses (Tr. at 58). She lived in a homeless shelter for five months (Tr. at 52). While she lived there, she volunteered to do the dishes and helped fix lunch (Tr. at 57-58). Just before the hearing, plaintiff moved into an apartment in Columbia which is for senior citizens with disabilities or who need a place to stay until they get a job or begin getting disability benefits (Tr. at 40-41). Plaintiff lives alone in her apartment, and she lives there free (Tr. at 57, 58). She was receiving food stamps and she was on Medicaid (Tr. at 41).

Plaintiff last worked at Wal-Mart, and worked there for almost four years (Tr. at 42, 55). In November 2001, she walked out on her job (Tr. at 54). She had been a greeter for the last six months she worked there, and before that she worked as a maintenance person, a night stocker, and as part of the set-up crew (Tr. at 54-55). Plaintiff was required to stand during her entire shift as a greeter (Tr. at 55). She asked about sitting down, and one manager said

25

yes and another manager "got all over [her] case about it"
and she was totally confused (Tr. at 55).  Plaintiff tried
to sue Wal-Mart for unemployment, but she was unsuccessful
(Tr. at 68-69).

Before working at Wal-Mart, plaintiff worked in
housekeeping or laundry for different motels (Tr. at 56).
She did that for over ten years (Tr. at 56).  Before that
she cleaned apartments, and she was also a bartender at one
time (Tr. at 56).  Plaintiff also had some maintenance-type
jobs (Tr. at 56).

About a year before the hearing, plaintiff got a job
carrying vacuums up stairs, but she only did that job for
three days (Tr. at 56).  Plaintiff has applied for jobs
driving, but she never got any interviews or call backs (Tr.
at 56-57).

Plaintiff cannot sit up straight in a chair because it
aggravates her back (Tr. at 45).  She can sit comfortably
for 35 to 45 minutes before needing to shift around in the
chair or get up (Tr. at 45).  Plaintiff can stand for an
hour or a little more than an hour (Tr. at 45).  Plaintiff
can walk "a pretty good distance" if she can take breaks
(Tr. at 46).  Although her doctor told her not to lift over
ten pounds, plaintiff testified that she can lift 20 pounds

26

but it puts pressure on her back (Tr. at 46).  If she is
using her hands to lift something like a cup or a glass of
water, she is fine (Tr. at 46).  But if she lifts something
larger, her hands fly open and she drops the object (Tr. at
46).

Plaintiff testified that she cannot work because if she
stands for a long period, her knees can give out (Tr. at
46).  If she lifts much, her back hurts (Tr. at 46).  When
she is walking, the sides of her legs can go totally asleep
and have no feeling in them whatsoever, and this happens all
of a sudden (Tr. at 47).  When asked what she does to
relieve the numbness, plaintiff said she has to get up and
walk around for at least 20 minutes (Tr. at 47).  Plaintiff
cannot stoop because she has no cartilage in her knee to
hold her (Tr. at 48).

Plaintiff's back pain is typically a six out of ten
(Tr. at 60).  Plaintiff's leg pain is also a six out of ten
(Tr. at 61).  Plaintiff's knee pain is about a four or a
five out of ten (Tr. at 61-62).  Plaintiff's back pain and
leg pain have progressed since 2001, but her knee pain has
stayed about the same (Tr. at 60-62).  Plaintiff experiences
pain all the time (Tr. at 63).  Plaintiff has been taking
the same amounts of the same medication since at least 2001

27

(Tr. at 63). She has no side effects from her medication
(Tr. at 65). Plaintiff has not seen her doctor regularly
for the past year and does not have any appointments, but
she intends to make one because of new hip pain (Tr. at 64).

On a typical day, plaintiff does not get up until 2:00
in the afternoon because she has to take a sleeping pill and
a pain pill (Tr. at 48). She has cereal to eat, makes her
bed, and tries to do a little bit of cleaning (Tr. at 49).
Her back hurts when she stoops to clean her bathtub (Tr. at
49). Plaintiff watches a little television, but otherwise
she walks in the long hallways of the apartment building or
walks outside (Tr. at 49). Plaintiff does her own cooking,
her own shopping, and her own laundry (Tr. at 67-68).
Plaintiff tries to go to bed around 11:00 p.m., but it can
take until 3:00 in the morning for her pain pills to start
working so that she can go to sleep (Tr. at 50).

When asked if she has any hobbies, plaintiff testified
that because of moving she has not had time to do any of the
hobbies she usually does (Tr. at 50-51). Plaintiff has a
car and a valid driver's license (Tr. at 59). She can drive
long or short distances (Tr. at 59). Plaintiff has a
computer and she plays games on it when she gets bored (Tr.
at 74). When she gets tired or her legs start hurting, she

28

gets up and does other things (Tr. at 74-75). She sits at her computer once or twice a day for about 20 minutes at a time (Tr. at 75).

Plaintiff has felt a little depressed since she had to leave her home (Tr. at 66). Her doctor told her that a psychiatrist would cost her a fortune, and she does not have the money to pay for that (Tr. at 66). Dr. Rose prescribed Celexa for plaintiff's depression (Tr. at 66-67).

## 2. Testimony of Carol Carson.

Ms. Carson, 63, lived with plaintiff at the homeless shelter for about four months (Tr. at 70-71, 73). Ms. Carson observed plaintiff help with the cooking, she would clean up, wash dishes, clean off the tables, and arrange the pots and pans in the cabinets (Tr. at 71). She went down to a storage room and sorted out bags of clothes that had been donated, and she rearranged the storage room (Tr. at 71-72). Plaintiff would perform these activities for 45 minutes to an hour at a time, and then would get up a walk around a little bit (Tr. at 72). Plaintiff recently finished embroidering two sets of pillow cases (Tr. at 72). Plaintiff goes to the mall with Ms. Carson to walk, and after a while she will need to sit down (Tr. at 72-73). Ms. Carson will be looking at things, and plaintiff might

29

suggest they go to the eating area and get something to eat or rest (Tr. at 73). Ms. Carson has observed plaintiff playing games on her computer, but she believes plaintiff is very smart and could work at a computer if she could have some breaks to stand up (Tr. at 73).

### 3. **Vocational expert testimony.**

Vocational expert Ruth Van Vleet testified at the request of the Administrative Law Judge. Ms. Van Vleet testified that the previous jobs held by plaintiff are unskilled, except the stocker position is semi-skilled (Tr. at 77). Her job as a cashier was light, the restaurant work was light, the housekeeper/sheet folder job was light, and the stocker was a bit more than medium exertion (Tr. at 77, 78). The greeter position at Wal-Mart was light as plaintiff performed it because she said she had to stand; however, it is usually performed in the sedentary to light level (Tr. at 77-78).

The ALJ's first hypothetical was as follows: The person can do light work but never climb a rope or scaffolds; may occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl; and could frequently balance (Tr. at 78). Ms. Van Vleet testified that such a person could work plaintiff's previous jobs as a door greeter, a

housekeeper, sheet folder, and a fast food cashier (Tr. at 79).

The second hypothetical added the following to the first hypothetical: the person is moderately limited in her ability to understand and follow complex or detailed instructions, but has no limitation in her ability to understand and follow simple, repetitive tasks (Tr. at 79). Ms. Van Vleet testified that the person could perform the same jobs as in hypothetical one (Tr. at 79).

The third hypothetical was the same as hypothetical one except the person is only able to do sedentary work (Tr. at 79-80). Ms. Van Vleet testified that such a person could do none of plaintiff's past relevant work (Tr. at 80). However, such a person could be a production worker, D.O.T. 734.687-018, with 439,000 jobs in the nation and 35,695 in Missouri (Tr. at 80). The person could also be a sedentary packager, D.O.T. 920.587-018, with 403,000 positions in the country (Tr. at 80).

The fourth hypothetical was the same as the second, except the work ability is sedentary instead of light (Tr. at 80). Ms. Van Vleet testified that such a person could still do the production worker or sedentary packager jobs (Tr. at 80).

31

Plaintiff's first hypothetical involved a person who had to take a break every hour to get up and walk around for about 20 minutes (Tr. at 82). Such a person could perform no work (Tr. at 82).

## V. FINDINGS OF THE ALJ

Administrative Law Judge Lauren Mathon issued her opinion on June 17, 2004 (Tr. at 14-19).

The ALJ found that plaintiff has not worked since her alleged onset date (Tr. at 15). She found that plaintiff suffers from knee and ankle osteoarthritis and back pain, impairments that are severe (Tr. at 17). Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17). The ALJ found that plaintiff has the residual functional capacity for light work reduced by moderate limitations in climbing ramps and stairs and in balancing, stooping, kneeling, crouching and crawling; she is precluded from climbing ladders, scaffolds, and ropes; she is moderately limited in understanding, carrying out, and remembering detailed and complex job instructions; she can adequately relate and interact with the public, supervisors, and co-workers; she can maintain concentration and attention for simple repetitive work; and she can tolerate job stress (Tr. at 18).

32

The ALJ found that with that residual functional capacity, plaintiff can return to her past relevant work as a Wal-Mart greeter, housekeeper, or cashier as previously performed and as generally performed in the national economy (Tr. at 18). Therefore, plaintiff was found not disabled at step four of the sequential analysis.

## VI. PLAINTIFF'S MENTAL IMPAIRMENT

Plaintiff argues that the ALJ failed to develop the record in regard to plaintiff's mental impairment. According to plaintiff, she had been feeling depressed for a year, had seen Dr. Farmer and Dr. Roos for depression, and yet the ALJ failed to discuss plaintiff's problems with depression.

Plaintiff did not allege depression in her application for disability benefits. She did not mention depression in her Claimant Questionnaire. Plaintiff testified at the administrative hearing that she had felt a little depressed since she had to leave her home and move into a homeless shelter. There are no other allegations of mental impairment made by plaintiff outside the medical records.

The medical records additionally show very little evidence of a mental impairment. On December 28, 2001, the month after plaintiff quit her job at Wal-Mart, she saw Dr.

33

Clark at the request of Disability Determinations and complained of depression and crying. Dr. Clark noted that plaintiff did not appear to be depressed or anxious, although she displayed displeasure with her son who wanted plaintiff to leave her car to him in her will. Two weeks later, on January 16, 2002, Dr. Altomari, a clinical psychologist, found no medically determinable mental impairment. On March 10, 2003, Dr. Maddox, a licensed psychologist, found that plaintiff suffers from borderline intellectual functioning, and his opinion was that plaintiff may have difficulty with complex or detailed instructions but would have no other mental impairment.

From the time plaintiff quit her job and filed for disability benefits until July 28, 2003 – nearly two years later – she never mentioned depression or any other mental impairment to any treating physician. On July 28, 2003, plaintiff told Dr. Farmer she was "curious" about depression because she was increasingly tearful and had trouble sleeping at night. Dr. Farmer noted that plaintiff's mood was appropriate and she was smiling. Despite that, he assessed depression without having run any tests or having any information other than that which is outlined above. Dr. Farmer recommended plaintiff see Dr. Roos.

34

On August 8, 2003, plaintiff saw Dr. Roos, a family practitioner, and said she had felt depressed over the last year since she lost her job. Her symptoms had gotten worse over the last six months because she had to file for bankruptcy and had numerous collection agencies calling her for money. Dr. Roos wrote, "Depression, per se, is not noted at this time." Even though he did not diagnose depression, he prescribed Celexa and Ambien.

A month later, on September 8, 2003, plaintiff returned to see Dr. Roos and reported that she was improved since seeing him a month earlier. However, she reported still being under stress due to her bankruptcy and the collection agencies continuing to call her for money.

Plaintiff was diagnosed with depression by only one doctor, Dr. Farmer, who performed no mental tests and gathered no information from plaintiff other than the fact that she was "curious" about depression. Dr. Roos, who specifically saw plaintiff regarding depression, did not diagnose her with depression. Plaintiff herself stated that her symptoms had improved after only one month of taking Celexa and Ambien. Dr. Altomari found no mental impairment, Dr. Maddox found no mental impairment other than difficulty with complex or detailed instructions. Dr. Clark found no

35

evidence of depression.  Despite reporting she may have depression when she saw Dr. Clark in 2001, plaintiff did not mention depression or any other mental impairment to any treating physician for almost two years after that.

The ALJ is entitled to rely on the fact that a claimant does not allege a mental impairment in an application for disability benefits or during an administrative hearing. Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994). Having a prescription for antidepressant medication does not establish that a claimant has a severe mental impairment. Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989).

In this case, the ALJ found that plaintiff may have difficulty with complex or detailed instructions.  This is the only mental health diagnosis that appears in the record. No other doctor found any evidence of depression, no other doctor found any limitations based on a mental impairment. Two psychologists rendered an opinion regarding plaintiff's mental impairment, and three other doctors, Dr. Clark, Dr. Farmer, and Dr. Roos, rendered opinions.  Dr. Clark found no depression. Dr. Roos found no evidence of depression, and was informed by plaintiff that her subjective symptoms were improved on Celexa and Ambien.  Dr. Farmer's diagnosis of

36

depression is based on nothing but plaintiff's "curiosity" about depression.

I find that the substantial evidence in the record supports the ALJ's finding that plaintiff would have difficulty with complex or detailed instructions but suffers from no other mental impairment. I further find that the ALJ did not err in failing to further develop the record on this issue. Therefore, plaintiff's motion for judgment on this basis will be denied.

### VII. OPINION OF DR. FARMER

Plaintiff argues that the ALJ failed to properly develop medical evidence regarding the opinion of plaintiff's treating doctor, Dr. Christopher Farmer. Specifically, plaintiff argues that the ALJ should have precisely inquired as to Dr. Farmer's opinion that plaintiff is "functionally disabled from her back pain."

A treating physician's opinion is granted controlling weight only when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). The opinion at issue here – Dr. Farmer's April

37

8, 2003, letter "to whom it may concern" – is not supported by any clinical or laboratory diagnostic techniques, is inconsistent with not only the other evidence in the record but with Dr. Farmer's own medical records, and is inconsistent with plaintiff's demonstrated abilities.

Plaintiff first saw Dr. Farmer on October 5, 2001, due to leg pain. He prescribed anti-inflammatories, ice, and physical therapy. There was no complaint of back pain during that visit, even though plaintiff's alleged onset date was one month away. Plaintiff next saw Dr. Farmer on April 17, 2002, and complained of swelling in her hands, legs and feet. She had "no chronic medical problems to speak of" and did not complain of back pain. Plaintiff saw Dr. Farmer again on November 25, 2002. Plaintiff was not taking any medications at that time, yet on exam she had full range of motion, no tenderness in her back, negative straight leg raising bilaterally, normal motion, and normal deep tendon reflexes. Dr. Farmer recommended exercises and stretching for both plaintiff's shoulder and her back and noted he would try to get her into an indigent medication program. Plaintiff saw Dr. Farmer again on January 10, 2003. Plaintiff's symptoms were unchanged. He gave her samples of an anti-inflammatory. The following month

Case 2:05-cv-04004-REL   Document 19   Filed 12/14/05   Page 38 of 44

plaintiff saw Dr. Farmer and said she bent over a week
earlier and noted pain in her low back ever since.  Dr.
Farmer found only mild tenderness, and her x-rays were
negative.  He recommended exercises, anti-inflammatories,
and heat as needed.  These are the only medical records in
Dr. Farmer's file prior to his writing the April 8, 2003,
letter at issue.

In the letter, Dr. Farmer stated that plaintiff has a
long history of back pain.  However, the first time she
complained to Dr. Farmer of back pain was November 25, 2002,
just over four months earlier.  Dr. Farmer said that
plaintiff's back pain can, at times, be very disabling to
her and she is unable to function.  There are no functional
restrictions in any of Dr. Farmer's medical records.  There
are not even any allegations by plaintiff that her back pain
limits her function or disables her in any way.  Dr.
Farmer's statement that plaintiff is currently functionally
disabled is based on nothing – not on plaintiff's subjective
complaints, not on Dr. Farmer's observations, not on any
tests.  There is simply nothing to support Dr. Farmer's
opinion that plaintiff is functional disabled.

Dr. Farmer's records subsequent to his April 8, 2003,
letter do no more to support his conclusions than the

records preceding it. Plaintiff saw Dr. Farmer on June 3, 2003, for back pain. Plaintiff had full range of motion limited only by obesity. He prescribed exercises and told her to lose weight. Plaintiff saw Dr. Farmer on July 28, 2003. He wrote, "She comes in today with her typical symptoms of mild achiness". This is hardly the comment one would expect from a doctor who, less than three months earlier, described his patient as functionally disabled from her pain. He noted that the anti-inflammatories relieve some of her symptoms. He performed an exam and found only mild pain to palpation and "no other significant findings on exam". He prescribed anti-inflammatories and exercises.

That is the extent of Dr. Farmer's records. There is absolutely nothing in any of his medical records to support his April 8, 2003, opinion. Even plaintiff's subjective complaints to him consisted of symptoms of mild achiness, not functional disability due to pain.

Dr. Farmer's April 8, 2003, opinion is not only inconsistent with his own records, it is inconsistent with everything else in the record. Plaintiff saw Dr. Haney on October 27, 2001, and did not mention back pain. Plaintiff saw Dr. Clark on December 28, 2001, and complained of leg and hand pain, but not back pain. Dr. Clark diagnosed only

40

intermittent low back pain. On January 4, 2002, plaintiff's back x-rays showed only minimal degenerative change, and she was prescribed an anti-inflammatory. On October 31, 2002, Dr. Sapp prescribed exercises and weight loss for her back pain.

No other doctor has made any significant findings with regard to plaintiff's back pain. Plaintiff has never been prescribed any treatment other than exercises, anti-inflammatories, and a recommendation to lose weight. Therefore, Dr. Farmer's April 8, 2003, opinion is inconsistent with the other medical evidence in the record.

Finally, I note that Dr. Farmer's April 8, 2003, opinion is entirely inconsistent with plaintiff's own abilities. Since her alleged onset date, plaintiff told Dr. Clark that she exercises doing a tape called "Walk Away the Pounds". She said she could sit forever, stand for an hour, lift 25 pounds, and walk six blocks. Dr. Clark found no restrictions in sitting, standing, walking, handling objects, or traveling; and she found that plaintiff could lift up to 25 pounds on a regular basis. On October 31, 2002, plaintiff said she was having no trouble reaching for things. On September 8, 2003, plaintiff told Dr. Roos that

41

she was getting good exercise in the form of walking the mall on a daily basis.

Plaintiff testified at the hearing that she did the dishes and helped fix lunch at the homeless shelter. She had applied for jobs driving, but had not gotten a call back. Plaintiff lives by herself and walks the long hallways in her apartment building. Plaintiff's friend testified that in the few months prior to the administrative hearing, plaintiff helped with cooking, she cleaned up after meals, she washed dishes, cleaned off the tables, arranged the pots and pains in the cabinets, sorted out bags of donated clothing, rearranged a storage room, and embroidered two sets of pillow cases. All of these demonstrated abilities are inconsistent with Dr. Farmer's opinion that plaintiff is functionally disabled due to back pain.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's decision to discredit Dr. Farmer's April 8, 2003, letter stating that plaintiff is functionally disabled. Therefore, her motion for judgment on this basis will be denied.

### VIII. ABILITY TO DO PAST RELEVANT WORK

Plaintiff argues that the ALJ's decision that plaintiff could return to her past relevant work is not supported by

42

substantial evidence.

The ALJ found that plaintiff has the residual
functional capacity to perform light work, slightly modified
as described above, but with no limitations on sitting,
standing, walking, or lifting beyond the requirements of
light work.  Title 20, Code of Federal Regulations, Section
404.1567(b) defines light work as follows:

> Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects
> weighing up to 10 pounds. Even though the weight lifted
> may be very little, a job is in this category when it
> requires a good deal of walking or standing, or when it
> involves sitting most of the time with some pushing and
> pulling of arm or leg controls. To be considered
> capable of performing a full or wide range of light
> work, you must have the ability to do substantially all
> of these activities. If someone can do light work, we
> determine that he or she can also do sedentary work,
> unless there are additional limiting factors such as
> loss of fine dexterity or inability to sit for long
> periods of time.

No doctor has ever placed any functional restrictions
on plaintiff.  The record discussed at length above
establishes that plaintiff can sit "forever"; she walks for
exercise in the mall, in the halls of her apartment
building, to an exercise tape; she was able to do
significant work in the kitchen while living in an apartment
for the homeless; she was able to rearrange a storage room,
restack pots and pans, and sort bags of clothing; she stated

43

that she had no trouble reaching for things or lifting up to 25 pounds.  There is no credible evidence in the record which is inconsistent with the ALJ's finding regarding plaintiff's residual functional capacity.  Therefore, plaintiff's motion for judgment on the ground that the ALJ improperly found that plaintiff could return to her past relevant work will be denied.

**IX.  *CONCLUSIONS***

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's determination that plaintiff's can return to her past relevant work. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 14, 2005

44